# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 10, 2006 Session

## STATE OF TENNESSEE v. ALBERT EVANS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-02257     Chris B. Craft, Judge**

---

**No. W2005-00161-CCA-R3-CD  - Filed May 17, 2006**

---

The defendant, Albert Evans, was convicted by a Shelby County Criminal Court jury of first degree felony murder, first degree premeditated murder, and especially aggravated robbery, a Class A felony.  The trial court merged the first degree felony murder conviction into the premeditated murder conviction, for which the defendant was sentenced to life without the possibility of parole, and sentenced the defendant to twenty-four years as a Range I, standard offender for the especially aggravated robbery conviction, to be served consecutively to the life sentence without parole.  On appeal, the defendant argues:  (1) the trial court erred in (a) admitting an exhibit, (b) in allowing the defendant's spouse to testify in violation of the marital privilege, and (c) in allowing the State to "proffer the contents of a prior statement" of a witness "as substantive evidence under the guise of impeaching" the witness with a prior inconsistent statement; (2) the evidence was insufficient to support his convictions; and (3) the trial court erred in sentencing the defendant.  Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

William D. Massey, Memphis, Tennessee (on appeal); Robert Parris and Lee Gerald, Memphis, Tennessee (at trial), for the appellant, Albert Evans.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jerry Harris and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On November 1, 2002, the severely beaten and stabbed body of the victim, Damon Johnson, was discovered underneath a mattress next to a dumpster at his ex-girlfriend's Memphis apartment complex. Subsequently, the defendant was arrested and indicted for murder in the perpetration of especially aggravated robbery, first degree premeditated murder, and especially aggravated robbery.

**Trial**

The victim's mother, Doris Johnson, testified that the victim was twenty-five years old when he died and left behind a wife and a young son.

Lashonda Brown[1] testified that, in October 2002, she was living at Barron Brook Apartments in Shelby County with her children and her sisters, Shazelle Evans and Larhonda Brown. Also living with the family were Lashonda's boyfriend, Dedrick Lewis, and Shazelle's husband, the defendant, who lived "there during the weekend." Lashonda testified that on October 28, 2002, "between 8:30 and 9:15" p.m., the victim, her ex-boyfriend, came to her apartment. The victim arrived in a "gray Taurus" and "was upset" over an argument he had with his wife. Lashonda said her sisters, Lewis, the defendant, and three children were at the apartment when the victim arrived. After staying for approximately twenty minutes, the victim left but returned at "maybe almost [around] 12 midnight," driving his white Nova.

Approximately twenty to thirty minutes after arriving for his second visit, the victim took Lashonda and her baby to a gas station and a doughnut shop. About an hour later, the trio returned to the apartment where Lashonda took the baby upstairs while the victim waited at his car.[2] As she was walking back downstairs to return to the victim, Lashonda saw the defendant "hit [the victim] in the back of the head with an iron bat." The victim "was in a daze" and "rolled over on the ground." Lashonda watched as the defendant hit the victim "again upside his head . . . four times in a row." She testified that there were "lumps in the top of [the victim's] head, and it was just full of blood there." Asked if the victim tried to do anything to the defendant, Lashonda said, "No," explaining that the victim "tried to . . . stand up. But when he did, his head hit the wall. It hit the . . . bricks on the wall." After the victim hit the wall, he fell again and "couldn't come out of that." She said she did not call the police about the beating because she was scared.

Lashonda identified a photograph of the victim's "white Nova" that he drove to her apartment that night and the victim's blue zipper jacket which had the words "Dirty South School of Hard Knocks" on it. She said she was with the victim when he purchased the jacket and did not know of the defendant ever owning such a jacket. She also identified a necklace as "the necklace [the victim] had around his neck . . . the last night that [she] seen him." She was with the victim when he purchased this necklace, which had a pendant on it, but said she did not recognize the pendant as the

---

[1]Because witnesses Lashonda Brown and Larhonda Brown share the same first initial and last name, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

[2]Lashonda lived in an upstairs apartment, the steps to which were outside the building.

victim's.[3] On cross-examination, Lashonda testified that the bat the defendant used to hit the victim belonged to Larhonda, who kept it in the trunk of her car.

Shazelle Evans,[4] the defendant's wife, testified that in October 2002, she and the defendant had been separated "[f]or about a year." She explained that the defendant came to her apartment "[m]ainly on the weekends" and that he had a girlfriend, Gladys Mitchell, with whom he lived "Monday through Friday." The defendant did not keep any of his clothes at her apartment. Shazelle said that the victim came to her apartment at "about 12 a.m." on October 28, 2002. After Lashonda and the victim left "to go get doughnuts," the defendant told Shazelle that "he was going to rob Little D," which was the victim's name. She testified that the defendant was no longer inside the apartment when her sister came home. Shazelle said when Lashonda "came up the first time, she brought the baby in the house, but the second time she came, she was jumping and hollering and screaming" that the defendant had "hit [the victim] with a bat." The next morning, the defendant returned to Shazelle's apartment and showed her "a silver chain" but did not tell her from where he had gotten it. Shazelle said she had seen the victim's necklace before but said it was not the necklace the defendant showed her that morning.

On cross-examination, Shazelle testified the defendant came to her apartment between 3:00 and 5:00 p.m. on October 28, 2002, and did not leave "[u]ntil about 2:30 that morning." She said that he left the apartment sometime that evening for "[p]robably like about 20, 30 minutes" and was not in the apartment when Lashonda returned from the store with the victim. On redirect examination, Shazelle acknowledged that she told the police that, the morning after the victim was beaten, the defendant "told [her] he took a silver link chain and a watch and a little plastic red light flashing thing" from the victim.

Larhonda Brown testified that on the night the victim was attacked, Lashonda came in the apartment repeatedly screaming that "[t]hey beat him," saying that "[the defendant] hit [the victim] across the head with a bat." Larhonda recalled the defendant coming back inside the apartment that night and retrieving what "looked like a Ginsu knife," which he never returned, from the kitchen. She said the defendant "threatened" them that "if anybody said anything [to the police], he was going to hurt someone."

Larhonda testified that she kept an "iron bat" in the trunk of her car, to which no one else had access, but she kept a set of keys "in the table" and "another [set] was in the door." She acknowledged that the defendant could have gotten inside her car "[b]y the keys being in the door."

---

[3]At this point, the trial court admitted the necklace and pendant into evidence "conditioned upon the State calling a necessary witness to ID it later."

[4]Because witnesses Shazelle Evans and Delores Evans share the same last name, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

Gladys Mitchell, the defendant's girlfriend, testified that the defendant stayed with her "three or four times a week" and kept his clothes at her house. Mitchell said that on the night of October 28, 2002, the defendant "came over about 12:30" driving "[a] little old beige or a cream color white car," saying that it belonged to "a friend." After Mitchell told the defendant "[t]o get that piece of shit out of [her] yard," the defendant moved the car. Mitchell acknowledged telling the police that the defendant said the car was "hot" and that "he parked it on Kimball in front of a vacant house across the street from the tattoo shop." She said the defendant was wearing "a light blue jacket" that looked like the jacket Lashonda identified as belonging to the victim. Mitchell had never seen the defendant wear the jacket before and when she asked him whose jacket it was, he told her it was none of her business. After this conversation, the defendant left and did not return until "[a]bout 3 or 3:30."

Mitchell identified a photograph of the victim's car that she was shown by police on November 4, 2002, and on which she wrote "[l]ook [sic] like the car I saw [the defendant] in and pushing out of driveway and into the street." She also identified a photograph of the victim's blue "Dirty South" jacket shown to her by the police on November 2, 2002, explaining that it was "[t]he jacket [the defendant] had on that night."

The victim's mother, Doris Johnson, was recalled to the witness stand by the State. She identified the victim's necklace, identified by prior witnesses, Lashonda and Shazelle, as the victim's. Johnson also recognized the pendant as the victim's, explaining that the victim wore the necklace and pendant together "[a]ll the time."

Bobby Montgomery testified that in October 2002, he worked at Cash America Pawn as an assistant pawn broker. He said that on October 29, 2002, the defendant pawned "a pendant charm, a cross." Montgomery identified a pawn ticket that described the pendant and contained the defendant's personal information, signature, and thumbprint. Shown the victim's necklace and pendant, Montgomery identified the pendant as the one "pawned by [the defendant]." He did not recall the necklace being with the pendant and explained that he remembered the cross pendant "because of the . . . two-toneness of the item. . . . [I]t was a unique piece."

Deborah Howard-Hooker, a fingerprint technician with the Shelby County Sheriff's Department, testified that she compared the thumbprint on the pawn ticket to the defendant's thumbprint and concluded that the print on the pawn ticket was the defendant's.

Alfred Jones, Jr. testified that at approximately 6:30 a.m. on November 1, 2002, he found the victim's body underneath a mattress by the dumpster at the Barron Brook Apartments. Jones "picked [the mattress] up and peeked at it under" and saw the victim on his back with his "throat cut." He informed a police officer near the apartment of his discovery.

Officer Aaron Frazier of the Memphis Police Department testified that after being flagged down by Alfred Jones, he located the victim's body underneath a mattress, saying that the victim was wearing boxer shorts and had several wounds "around the skull and . . . also on his neck." Sergeant

-4-

Troy Berry of the Memphis Police Department testified that on November 1, 2002, he was assigned to the crime scene division and responded to the Barron Brook Apartments to take photographs of the crime scene. Berry said that the victim had "[g]ray duc[t] tape" on both arms "[j]ust above the wrists."

Officer Marcus Berryman of the Memphis Police Department Homicide Bureau testified that on November 2, 2002, he went to Cash America Pawnshop "looking for information on a pendant. A cross pendant." Berryman retrieved the defendant's pawn ticket from the shop, but the pendant was not located. He subsequently went to Gladys Mitchell's house and ultimately to the house next door to Mitchell's, where "Renee" lived. At that house, Berryman found the victim's Dirty South jacket, necklace, and cross pendant in a bedroom. The necklace and pendant were "located in the top right dresser draw[er]" and were attached to each other.

Officer Timothy Wayne Cooper of the Memphis Police Department's Crime Response Unit identified photographs he made of the crime scene on November 3, 2002, including a photograph of the "breezeway area just east of 3000 Barron," where Lashonda Brown's apartment was located. Blood was found on the brick wall of the breezeway and "a large pool of blood" was found on the ground next to the brick wall. Officer Mary Pickens of the Memphis Police Department's Crime Scene Unit testified that on November 1, 2002, she was called to a vacant house on Kimball to investigate a homicide and identified photographs she took of the victim's car, an "Olds Omega, white in color."[5] Pickens also collected "a red piece of carpet" and red "[s]mall fibers that were taken by the trunk keyhole."

Dr. Teresa Campbell, a Shelby County assistant medical examiner, testified that she performed the autopsy of the victim's body which revealed "numerous lacerations to the top of the head, to the forehead, to the eye area. Lacerations and contusions or bruises were seen on the face." The victim also had "an incision or cut to the back of the head near the neck[,] [s]everal incisions actually" and a laceration "on the left forehead caused by blunt trauma" which "was rather deep, went to the bone. And there was a skull fracture beneath this laceration." Dr. Campbell testified that although the lacerations on the victim's head "certainly could [have been caused by] a bat," she could not "rule out other objects either." On the victim's neck was "an incised wound that went all the away across" but "did not extend deeply to vital structures such as the carotid arteries." The incised wound "did get the right external jugular [vein]" on the right side of the victim's neck.

In addition, the victim had the following injuries, according to Dr. Campbell: "multiple flick or drag marks" on his chest, a "knife stab wound to the lower chest . . . that penetrated into the liver," "several stab wounds" on his back right shoulder, a "stab wound to the right side of the back," abrasions on his lower back, "a bruise or contusion to the top of the right shoulder," and "multiple contusions and abrasions" on his arms and legs. The victim had "duc[t] tape wrapped around the

---

[5]The "Olds Omega" car photographed by Officer Pickens is the same "white Nova" car Lashonda Brown identified as the victim's and the same car Gladys Mitchell identified to the police as the one the defendant drove to her house the night the victim was killed.

forearms, both forearms. But [his] arms were not tied together." Dr. Campbell testified that the victim "had some yellow abrasions to his skin in the lower extremities indicating scraping of the skin after death because there was no bleeding into it so it looked yellow." She also identified "defensive wounds" on the victim's hands and said that "red fibers [were] recovered from [the victim's] hair, the top of his head." The cause of the victim's death was multiple injuries that included "the blunt trauma to the head, the incised wounds of the neck, and stab wounds to the abdomen."

Qadriyyah Debnam, a forensic scientist with the Tennessee Bureau of Investigation Memphis Crime Laboratory, testified that DNA tests of the blood located on the brick wall of the Barron Brook Apartments matched the victim's DNA. Debnam also said the carpet recovered from the trunk of the victim's car tested positive for human blood, but she was unable to get a DNA profile from this blood to match it to the victim. Linda Littlejohn, a microanalyst with the Tennessee Bureau of Investigation Crime Laboratory, testified that her analysis of the red fibers from the victim's head, the red fibers from the trunk keyhole of the victim's car, and the red carpet from the victim's trunk revealed that they were all consistent with each other.

The defendant elected not to testify and rested his case without presenting any proof.

**Sentencing Hearing**

Christina Lane, a records clerk with the Shelby County Criminal Court Clerk's Office, testified that the defendant pled guilty to aggravated kidnapping and was sentenced to "8 years at 30 percent on December the 5th of 1990."

Delores Evans, the defendant's mother, testified that the defendant's father left when the defendant was one year old and he never had a father figure. She described the defendant as a "sweet baby" who helped her with the household chores, saying he never had any violent incidents and "was always respectable" to people.

Following the hearing, the jury sentenced the defendant to life imprisonment without the possibility of parole for the murder convictions. At the sentencing hearing for the especially aggravated robbery charge, the trial court sentenced the defendant as a Range I, standard offender to twenty-four years, to be served consecutively to the life sentence.

## ANALYSIS

### I. Admission of Victim's Necklace and Pendant

The defendant argues the trial court erred in admitting into evidence the victim's necklace and pendant, asserting that the exhibit, particularly the pendant, was identified as belonging to the victim solely by the testimony of the victim's mother, after she was recalled to the witness stand in violation of Tennessee Rule of Evidence 615. The State responds that the defendant has waived this

issue because he failed to object to the witness's testimony until after it was completed. We agree with the State.

Tennessee Rule of Evidence 615, "colloquially referred to as 'The Rule,'" see Neil P. Cohen et al., Tennessee Law of Evidence, § 6.15[2] (5th ed. 2005), explains the rule of sequestration:

> At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. In the court's discretion, the requested sequestration may be effective before *voir dire*, but in any event shall be effective before opening statements. The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

The Tennessee Supreme Court has said that "[t]he purpose of the rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992) (citing Smith v. State, 554 S.W.2d 648, 651 (Tenn. Crim. App. 1977)). We have previously explained the authority of the trial court in considering alleged violations of the rule:

> Rule 615 does not prescribe a specific sanction for its violation. Instead, courts retain the discretion to impose a variety of sanctions appropriate to the circumstances. State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992); see also N. Cohen et al., Tennessee Law of Evidence § 6.15[11][b] (4th ed. 2000). The trial court may, as a sanction, exclude the testimony of a witness who hears other testimony while subject to a sequestration order. See State v. Weeden, 733 S.W.2d 124, 125 (Tenn. Crim. App. 1987). The decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse and prejudice to the complaining party. State v. Chadwick, 750 S.W.2d 161, 166 (Tenn. Crim. App. 1987).

State v. Black, 75 S.W.3d 422, 424–25 (Tenn. Crim. App. 2001).

We will set out how this matter arose in court. Based upon Lashonda Brown's testimony that the necklace belonged to the victim, the State initially attempted to introduce into evidence the necklace and cross pendant. The defendant, however, objected to the pendant's introduction because Lashonda said she did not recognize it. In response to the objection, the trial court allowed the necklace and pendant to come into evidence "conditioned upon the State calling a necessary witness

to ID [the pendant] later." Without objection from the defendant, the State recalled the victim's mother, Doris Johnson,[6] who testified that the cross pendant and necklace belonged to her son. Only after the next witness had been sworn did the defendant object to Johnson's "entire testimony based on the fact that the rule had been invoked." Additionally, the defendant requested "a curative instruction . . . to disregard her testimony." In denying both the objection and motion for a curative instruction, the court explained the witness had "already testified and got[ten] off the stand. And so [the court] can't rule on an objection that wasn't made . . . . [The court] can't untestify her. It's too late. Can't unrung a bell."

On appeal, the defendant argues that "[t]he trial court's decision permitting Ms[.] Johnson to testify" constituted "an egregious violation of the sequestration rule." This argument ignores the fact that the defendant failed to make a timely objection to the testimony; and consequently, as the trial court correctly noted, it could not rule on an objection that was not made. We agree with the State that the defendant's failure to object to Johnson's recalled testimony until *after* she left the witness stand constitutes a waiver. See Tenn. R. App. P. 36(a), Advisory Commission Cmts. ("[A] party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error.").

## II. Marital Privilege

Prior to his wife, Shazelle Evans, taking the stand and in anticipation that her testimony would include his statement that "he was going to rob [the victim]," the defendant sought to invoke "the marital privilege exception." The trial court allowed Mrs. Evans to testify as to this statement, and the defendant argues on appeal that this was error.

Tennessee's marital communication privilege is codified at Tennessee Code Annotated section 24-1-201(c)(1) (2000), which provides:

> (1) In a criminal proceeding a marital confidential communication shall be privileged if:
>
> (A) The communications originated in a confidence that they will not be disclosed;
>
> (B) The element of confidentiality is essential to the full and satisfactory maintenance of the relation between the parties;
>
> (C) The relation must be one which, in the opinion of the community, ought to be sedulously fostered; and

---

[6]Johnson initially testified on the first day of trial as the State's first witness. She was recalled on the second day of trial after four other State witnesses had testified.

(D) The injury to the relation by disclosure of the communications outweighs the benefit gained for the correct disposal of litigation.

This privilege "is rooted in common law and was created to foster 'the sacredness of the home and the peace of families.'" State v. Price, 46 S.W.3d 785, 799 (Tenn. Crim. App. 2000) (quoting McCormick v. State, 135 Tenn. 218, 186 S.W. 95, 97 (1916)). Once a trial court finds that "a marital communication is privileged, it shall be inadmissible if either spouse objects." Tenn. Code Ann. § 24-1-201(c)(2).

A trial court must find all four factors applicable before permitting a spouse to invoke the martial communication privilege. In State v. Mitchell, 137 S.W.3d 630, 638 (Tenn. Crim. App. 2003), this court considered "whether the time of analysis for the presence or absence of the four factors is when the communication occurs or at the time of the trial court's inquiry into the application of the privilege," concluding that "factor (A) focuses on the expectation of the communicating spouse *at the time of the communication*, whereas assessment for the presence of factors (B), (C) and (D) must be done from the facts *as they exist at the time of the trial court's ruling*." Id. (emphasis added). "On appellate review, we must defer to the lower court's findings of fact relative to the existence or non-existence of the four factors unless the evidence preponderates to the contrary." State v. Winters, 137 S.W.3d 641, 662 (Tenn. Crim. App. 2003) (citing Price, 46 S.W.3d at 802).

In the present case, the trial court found the marital privilege exception did not apply to the defendant's statement he made to his wife because none of the four factors discussed above was present:

One, the communication must originate in a confidence that it will not be disclosed. I'm not sure that that's true in this case.

Secondly, this element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties which I don't find is clearly shown.

Thirdly, the relation must be one which in the opinion of the community ought to be sedulously fostered. He was in an adulteress [sic] relationship. And it seems to me this marriage would not be one necessarily of that kind.

But, fourthly, as required that the injury that would inure to the relation by the disclosure of the communication must be greater than the benefit thereby gained for the correct disposal of litigation.

And in this case if he told her that he was going to rob someone who he later robbed and murdered, I don't think in my mind that that's something that will help their relationship to the extent -- especially if they're not living together as man and

-9-

wife -- that would be counterbalanced by the benefit gained by correct disposal of litigation which would mean in this case allowing the proof in.

So under those four conditions that are mandated by the statute and by case law, I find that this is not a privileged communication. I'm going to allow it in.

As explained by Neil P. Cohen et al., Tennessee Law of Evidence, § 5.01[4][d] (5th ed. 2005), the proponent of the privilege bears the burden of proof to show that it should be applied:

In most cases a privilege protects an individual, who alone possesses the facts needed to support the existence of the privilege. Accordingly, it is generally held that the party asserting a privilege has the burden of proving that the privilege is applicable.

This principle was applied in Bryan v. State, 848 S.W.2d 72, 80 (Tenn. Crim. App. 1992), where the court held that "the client has the burden of showing that the communications were made in the confidence of the attorney-client relationship." Likewise, in Boyd v. Comdata Network, Inc., 88 S.W.3d 203, 214 (Tenn. Ct. App. 2002), the court of appeals determined that "[t]he proponent of the common interest privilege has the burden of establishing the necessary elements of the privilege."

In the present appeal, in asserting that the marital privilege should be applied, the defendant established only that he and the witness were married at the time he made the statement to her. However, the proof, otherwise, showed that Lashonda Brown's two sisters, as well as Dedrick Lewis and three children, had been present at the two-bedroom apartment around the time of the statement although it is unclear who else may have been present and within earshot when the statement was made. No showing was made that the statement "originated in a confidence" that it would not be disclosed or even that it was not made in the earshot of others. Likewise, although the defendant argues on appeal that the proof established the existence of factors (B), (C), and (D), it is without question that, at the time of the statement, the defendant was separated from his wife and spent the majority of his time with his girlfriend, at whose apartment he kept all of his clothes. Thus, it is unclear how the defendant can assert that the statement should be kept confidential for "the full and satisfactory maintenance of the relation between the parties" and that his tenuous relationship with his wife "ought to be sedulously fostered." Accordingly, we conclude that the record supports the determination of the trial court that the defendant failed to establish that the marital privilege applied to the statement.

### III. Prior Inconsistent Statement

The defendant argues the trial court erred "by permitting the [State] to proffer the contents of a prior statement by the witness Gladys Mitchell as substantive evidence under the guise of impeaching Ms. Mitchell with a prior inconsistent statement." The State responds that the defendant waived this issue because he failed to contemporaneously object. We agree with the State.

The use and admissibility of the prior statement of a witness is governed by Tennessee Rule of Evidence 613, which provides in pertinent part:

> (a) Examining Witness Concerning Prior Statement.  In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

> (b) Extrinsic Evidence of Prior Inconsistent Statement of Witness.  Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Our supreme court has explained that "[a]s with any evidence, a prior inconsistent statement may be offered for any purpose at all, although its *admissibility* may be limited to certain issues depending upon the purpose for which it is offered." State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000) (emphasis in original).  Although generally used to impeach the credibility of a witness, prior inconsistent statements may be admissible as substantive evidence under certain circumstances, as the Smith court explained:

> Our cases have consistently held that a prior inconsistent statement is admissible under the Rules of Evidence when the prior statement is used to impeach the credibility of a witness.  See, e.g., Jones v. Lenoir City Car Works, 216 Tenn. 351, 356, 392 S.W.2d 671, 673 (1965) (stating that "prior inconsistent statements of a witness are admissible for the purposes of impeachment and testing the credibility of the witness").

Id.  If a party fails to timely object, the prior inconsistent statement can be considered by the trier of fact as substantive evidence:

> When a party does not object to the admissibility of evidence, though, the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its "natural probative effects as if it were in law admissible."  State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981).  If a prior inconsistent statement does not fall within a recognized exception to the hearsay rule, for example, it is certainly subject to objection as hearsay and limitation under the Rules of Evidence.  Merely being subject to objection, however, does not mean that such evidence cannot be considered for its substantive value when no objection is raised.

Id. at 280.

During the State's direct examination of the defendant's girlfriend, Gladys Mitchell, she began giving vague responses to questions about the night the victim was killed and the days that followed. The State responded by asking detailed questions about whether she remembered making certain statements to the police after the murder, generally eliciting responses that if the information was in her statement, she gave that answer to the police.

Upon the defendant's second objection for leading, the following exchange took place during a bench conference:

> [THE STATE]: Your Honor, I'm going to declare her a hostile witness. She still talks to [the defendant]. She doesn't want to be here today. She still visits him. And she's the one who brought his clothes down here today. She's not cooperating with us today.
>
> And, also, as an officer of the court I can tell you we've had her in our office under very peaceful circumstances. She was exceptionally cooperative with us. She read that statement. We went over everything. She identified that car and that picture to me as the car with her present.
>
> . . . .
>
> [S]he has completely crawfished on us on all this stuff. She went over all that that she's been talking about. She told us about that and affirmed that -- not that she gave the statement but that it was true.
>
> . . . .
>
> [DEFENSE COUNSEL]: . . . My only response is that she's not giving one adverse answer that I can see yet other than the fact that she doesn't remember. She said everything in the statement is true. She's agreed with everything they've said.
>
> [THE STATE]: But she did say she doesn't remember what's in the statement. And we've been over this statement.
>
> THE COURT: Okay. Now, you can show her her statement and you can ask her if she recognizes that as her statement and if she remembers making it.
>
> . . . .
>
> . . . [Y]ou no longer have to have a witness declared hostile to impeach them with their own statements. Now, before I would allow you to lead the witness, not with a statement, just lead the witness in their answers, I would have to have some proof that they're actively going back on their statements.

So what -- but I will allow you and -- and both sides, you may impeach your own witnesses with any inconsistent statements they've made. But first you have to let them look at the statement and see whether or not they've made it first.

. . . .

[DEFENSE COUNSEL]: Your Honor, I'm just saying that there's been nothing inconsistent.

. . . .

THE COURT: -- I think the problem is what [the State] is saying is that the statements she's making now are inconsistent with prior statements. And I can't rule on that –

. . . .

[B]ecause she's not being asked about a prior statement. Even a prior statement made in the office. If you asked didn't you tell us this in the office and, you know, are you not now changing your story. I will allow leading questions like that under the circumstances.

Following the bench conference, the State presented Mitchell's police statement to her and she agreed that it was her statement and that it was "a statement to the best of [her] memory as to what happened the week of October the 28th when this murder took place." Later in the questioning, the State read a portion of the statement to Mitchell without initial objection from the defendant:

[THE STATE]: Now, looking back at your statement, . . . do you see the question at the top of the page where it reads:

Did you and [the defendant] discuss the white rusty Nova that you saw him driving on the early morning of Tuesday, October the 29th of 2002?

Do you remember being asked that question?

. . . .

A       Yes.

Q       Do you remember your answer?

[DEFENSE COUNSEL]: Your Honor, I'm going to have –

-13-

A       Yes.

        [DEFENSE COUNSEL]:  – to ask to be guided to where you're at now.

        THE COURT:  All right.

        . . . .

Q       You remember your answer that day, Ms. Mitchell?

A       Yes.

Q       What was your answer?

A       Uh –

        [DEFENSE COUNSEL]:  Well, Your Honor –

A       – he called me from –

        [DEFENSE COUNSEL]:  – she's –

A       – he called me from –

        [DEFENSE COUNSEL]:  – reading the statement.

        THE COURT:  Yes, sir.  Would y'all approach the bench, please?

        . . . .

        All right.  Now usually the proper form is for you to ask her did you give this–

        [THE STATE]:  Answer.

        THE COURT:  – [A]nswer.  And if they want to object because it's hearsay and it's not relevant or it's not contradicting anything . . . she says, then I won't allow it.  Also, that – when you . . . if she reads it, it's evidence.  If you read it and ask her if she made it, then it's not evidence.  Her answer would make it evidence and so you do it in the proper form.

        . . . .

-14-

Q       Directing your attention back to the fourth page, Ms. Mitchell, the first question on the first -- fourth page. Do you remember giving this answer in response to the question that was asked? Do you remember saying:

> Yes. Yesterday, Friday, about 7:30 to 8 p.m., [the defendant] called me from work and asked me if I saw the news. He told me that the car I saw him driving was hot. I asked him where it was now. And he told me that he parked it on Kimball in front of a vacant house across the street from the tattoo shop. He also told me that the police were over to Nette[7] and them's house. I got out of the bed and went looking. I was afraid to go by myself, so I called this guy down the street and I was telling him about it. He told me that [the defendant] was lying, that [the defendant] wasn't that kind of person. I dressed – drove us over on Kimball to look for the car, but we didn't see the car. I thought that [the defendant] was lying because we didn't see no car. Then we drove over to the Barron Brook Apartments to see if the police were really over at Nette's house. I did see the police over there, but I didn't know which house they was at. I came back to the house and me the guy [sic] discussed why he would do that if he did it. [The defendant] called me back about 9 p.m. and ask[ed] me if the police were over at Nette's house. I told him that the police were over there, but I didn't know if they were at Nette's house. I told him to prove to me that he was telling me the truth. Then he told me to dial Petey's[8] phone. So I did on three-way, and he told me to shut up and don't say nothing and when he said bye, to hang up. [The defendant] asked Petey how many police was in the house, and she was crying and said three. Then he asked her what they were doing, and she said asking a lot of questions. He told her to be calm, sit down and don't be upset. He said that he had those girls trained to be quiet. He said bye and I hung up. I really got nosey then, and I told him that I kn[e]w he wasn't lying and told him that he had made a believer of me. I told [the defendant] that my man was coming over tonight, and he said cool. But any other time, he would be mad. But the police would be looking for him, so he wouldn't have been there anyway.

Is that the answer that you gave the police?

A       Yes.

---

[7]Mitchell said "Nette" was the defendant's wife, Shazelle Evans.

[8]When asked who "Petey" was, Mitchell responded, "I guess [the defendant's] sister-in-law."

Q      Was that the truth?

A      Yes.

Q      And you're telling the truth today; correct?

A      Correct.

Q      So he did discuss to you what happened with the car that night, did he not?

A      Well, yes.

The State finished questioning Mitchell without any further objections by the defendant.

On appeal, the defendant argues that Mitchell's police statement should not have been read to the jury to impeach her because there was "no inconsistency between her testimony and the statement" with regard to whether she told the police that the defendant told her the car he was driving that night was "hot" or that the defendant told her that he parked the car on Kimball. He maintains that "this was an improper attempt at impeaching without any foundational testimony which was contrary to anything the witness said to the police."

The problem with the defendant's argument is that it is being made for the first time on appeal. As the State correctly noted in its brief, the first time the State read a portion of the witness's police statement and asked the witness if the statement was true, the defendant failed to make an objection. The defendant's later objection to the State's questioning was only that the State was leading the witness. Finally, prior to the State's reading a large portion of the police statement, the trial court noted that if the defendant wanted "to object because it's hearsay and it's not relevant or it's not contradicting anything . . . she says, then I won't allow it." However, despite the court's ruling, the defendant failed to make any further objections. Consequently, the issue is waived. See Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1). In addition, we note that absent an objection for hearsay, the statement could be considered as substantive evidence by the trier of fact. See Smith, 24 S.W.3d at 280. However, as a practical matter, the statement was confusing and added little, even to the extent it may have impeached Mitchell's testimony. Further, in view of the strength of the State's case, any error in utilizing this statement at trial was harmless.

### IV. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Thus, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

-16-

doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); <u>see also</u> Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); <u>State v. Evans</u>, 838 S.W.2d 185, 190-92 (Tenn. 1992); <u>State v. Anderson</u>, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. <u>See</u> <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

<u>Bolin v. State</u>, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing <u>Carroll v. State</u>, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A conviction based on circumstantial evidence is permitted in Tennessee. <u>State v. Tharpe</u>, 726 S.W.2d 896, 899 (Tenn. 1987). Whether the conviction is based upon direct or circumstantial evidence, the standard for appellate review is the same. <u>State v. Johnson</u>, 634 S.W.2d 670, 672 (Tenn. Crim. App. 1982). On appeal, the State is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence. <u>State v. Carruthers</u>, 35 S.W.3d 516, 558 (Tenn. 2000). The weight given to circumstantial evidence is for the jury to determine. <u>Williams v. State</u>, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974). Circumstantial evidence alone may be sufficient to convict one of a crime, if such evidence sufficiently proves all the necessary elements. <u>Tharpe</u>, 726 S.W.2d at 899-900. In cases that hinge upon circumstantial evidence, it is well settled that the proof must be consistent with the guilt of the defendant and inconsistent with his innocence, and sufficiently strong to overcome every other reasonable hypothesis except that of guilt. <u>Id.</u> at 900; <u>State v. Bigsby</u>, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000).

The defendant was convicted of first degree premeditated murder and especially aggravated robbery. First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). "'[P]remeditation' is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." <u>Id.</u> § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." <u>Id.</u> § 39-11-106(a)(18). Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the

person in fear." Tenn. Code Ann. § 39-13-401(a) (2003). Especially aggravated robbery is a robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2003).

In attacking the sufficiency of the evidence, the defendant reiterates his argument "that the [Doris] Johnson testimony was wrongly admitted which in turn directly led to the admission of Exhibit 7 [the victim's necklace and pendant]. Apart from the critical evidence provided by Doris Johnson, these convictions cannot withstand a sufficiency analysis." As previously set out, the defendant waived his argument concerning the admittance of the victim's necklace and cross pendant because he failed to timely object to Doris Johnson's testimony. However, even if the exhibit should not have been admitted, the remaining evidence is sufficient to support the defendant's conviction. Specifically, we note Lashonda Brown's testimony that she witnessed the defendant strike the victim in the head four times with an iron bat. The pathologist testified that the victim's cause of death was multiple injuries, which included "the blunt trauma to the head." In addition, the evidence showed that the defendant told his wife that he intended to rob the victim, he was observed leaving his wife's apartment carrying a Ginsu knife, he was observed by his girlfriend wearing the victim's jacket and driving the victim's car the night that he struck the victim with the bat, and the victim's jacket was located in the house of the next-door neighbor of the defendant's girlfriend. All this evidence was more than sufficient to support the jury's finding that the defendant was guilty of especially aggravated robbery and first degree premeditated murder.

## V. Sentencing

The defendant argues: (1) there was "not competent evidence in the record" to support the jury's finding that he has a prior violent felony; and (2) the trial court erred in sentencing him to twenty-four years for his especially aggravated robbery conviction because the court wrongly believed it had to start with a presumptive sentence of twenty years for the Class A felony conviction; and (3) the court erred in ordering the sentence to be served consecutively to his life sentence without the possibility of parole.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-402, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. If the appellate court determines the sentence is erroneous, it "may affirm, vacate, set aside, increase or reduce the sentence imposed or remand the case or direct the entry of an appropriate order." Tenn. Code Ann. § 40-35-402(c) (2003).

## 1. First Degree Premeditated Murder Sentence

Before a defendant may be sentenced to life in prison without the possibility of parole, a jury must find the State proved beyond a reasonable doubt the existence of one or more statutory aggravating circumstances. See Tenn. Code Ann. § 39-13-204(i) (2003). Here, the jury found the following aggravating circumstances: (1) the defendant was previously convicted of a felony "whose statutory elements involve the use of violence to the person," see id. § 39-13-204(i)(2); (2) "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," see id. § 39-13-204(i)(5); and (3) "the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit . . . robbery." See id. § 39-13-204(i)(7).

The sole complaint in this regard the defendant makes on appeal is:

[T]here is not competent evidence in the record of the prior violent felony in that the prosecution offered the testimony of Christina Lane purporting to authenticate [an exhibit] as a true copy of the relevant judgment form pertaining to a conviction of aggravated kidnapping on December 5, 1990. This exhibit, however, is neither a judgment form nor a true copy of one. It is a "Negotiated Plea Agreement" form which is used in Shelby County.

The State responds that "the defendant has waived this issue because he failed to contemporaneously object to the introduction" of the exhibit. We agree with the State. The defendant neither raised any objection to Lane's testimony concerning his aggravated kidnapping conviction nor did he argue that he did not have this prior conviction. This issue is waived for appeal. Tenn. R. App. P. 36(a).

In addition, even assuming *arguendo* that the State failed to prove the defendant's prior felony record beyond a reasonable doubt, the jury found two other aggravating factors were established and the defendant raises no objection to these findings on appeal. As stated previously,

a jury must find the existence of only one or more aggravating circumstances to sentence the defendant to life without the possibility of parole. This issue is without merit.

## 2. Especially Aggravated Robbery Sentence

The defendant argues that the trial court erred in both enhancing his especially aggravated robbery sentence to twenty-four years and in ordering the sentence to run consecutively to his life sentence. We will review each claim separately.

### a. Sentence Length

The defendant argues his sentence of twenty-four years violates the Criminal Sentencing Reform Act of 1989. As a Range I, standard offender convicted of a Class A felony, the defendant was subject to a sentence ranging from fifteen to twenty-five years. See Tenn. Code Ann. § 40-35-112(a)(1) (2003). Under the 1989 Sentencing Act, the sentence to be imposed for a Class A felony is presumptively the midpoint of the range unless there are enhancement factors present. Id. § 40-35-210(c) (2003). Procedurally, the trial court is to increase the sentence within the range based upon the existence of any applicable enhancement factors and then reduce the sentence as appropriate based on applicable mitigating factors. Id. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

The trial court enhanced the defendant's sentence to twenty-four years after applying enhancement factors (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range; (3), the defendant was a leader in the commission of an offense involving two or more criminal actors; (6), the defendant treated or allowed the victim to be treated with exceptional cruelty; and (21), the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult. See Tenn. Code Ann. § 40-35-114(2), (3), (6), (21) (2003). The defendant's only argument on appeal as to the length of his sentence is in regards to the trial court's declaration that, in considering the sentence, the court was going to start "at 20 years, as [it was] obligated to do under the statute." The defendant argues that under State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), "[i]t is now clear that the Criminal Sentencing Reform Act of 1989 does not mandate a presumptive sentence of 20 years for especially aggravated robbery."[9] In Gomez, our supreme court explained:

> The Reform Act authorizes a discretionary, non-mandatory sentencing procedure and requires trial judges to consider the principles of sentencing and to engage in a qualitative analysis of enhancement and mitigating factors. The Reform Act does not include a formula, a grid, or any other mechanical process. It instead sets out broad

---

[9]We note that the Gomez decision was released after the defendant was sentenced.

sentencing principles, enhancement and mitigating factors, *and a presumptive sentence*, all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature.

163 S.W.3d at 661 (emphasis added). Thus, the Gomez decision clearly did not end presumptive sentencing. This issue is without merit.

### b. Consecutive Sentencing

The defendant argues that the trial court erred in ordering his twenty-four- year sentence to be served consecutively to his life sentence without the possibility of parole. Tennessee Code Annotated section 40-35-115 provides that a trial court may in its discretion impose consecutive sentencing when it finds any one of a number of different factors by a preponderance of the evidence, including (4), that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4) (2003). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460–61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937–38 (Tenn. 1995).

In determining that the defendant's sentences should be served consecutively, the trial court opined that he is "a dangerous offender [in that] [h]is behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," because the victim "was beaten senseless with a bat, was spirited away. His throat was cut. He was tortured. He was left. His body was dumped under a mattress next to a dumpster for homeless people to find." The court concluded that "confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life" and "that the aggregate length of [the defendant's] sentences, if run consecutively, relates to the offense in which he stands convicted, which is torturing and killing a man who's guilty of absolutely nothing other than dating a girl this man knows." The only argument the defendant makes on appeal regarding his consecutive sentencing is that it "is not authorized based on a sentencing judge's finding that the offender is unwilling 'to lead a productive life.'" In fact, the trial court explained at length why consecutive sentencing was appropriate, and we conclude the record amply supports that decision. This issue is without merit.

### CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE